■ LORETTA C. CASSAR, as Administratrix of the Estate of PAUL CASSAR, Deceased, Respondent, v CENTRAL HUDSON GAS & ELECTRIC CORPORATION et al., Appellants.—Main, J. Appeal from a judgment of the Supreme Court (Bradley, J.), entered May 19, 1986 in Sullivan County, upon a verdict rendered in favor of plaintiff.

In 1948, the City of New York and Central Hudson Gas & Electric Corporation, defendants herein, entered into a contract whereby, *inter alia,* the city would build an aqueduct between the Neversink and Roundout reservoirs and Central Hudson would construct a hydroelectric generating plant along side the aqueduct near the Hamlet of Grahamsville in Sullivan County. The plant was to be constructed in such a manner as to use the city-owned water running through the aqueduct for the production of electric power. The water, after clearing the plant, would continue to flow within the aqueduct to its discharge point where the water emptied into Chestnut Creek and then continued on to the Roundout reservoir. The city determined the amount of water that was to flow through the aqueduct each week and Central Hudson, upon being informed of the amount, would determine how much water would be run through the turbines and upon which days and at what hours.* Generally speaking, Central Hudson's determination as to the turbine use was based upon the usage patterns of its customers. The flow of water through the aqueduct can be regulated or stopped by manipulation of the "broom gates" located at the upper end of the aqueduct and the flow of water, once in the aqueduct, can be stopped at the hydroelectric plant by completely closing the "wicket gates".

On the afternoon of June 21, 1982, decedent, Paul Cassar, and his friend and neighbor, Christopher Phillips, decided to go "tubing" in Chestnut Creek. Tubing is an exercise wherein one floats and hand paddles while resting upon an inflated inner tube. At the point on the creek where the boys entered the water, the creek was from 1 to 3 feet deep and the current was steady and moderate. Both boys had engaged in this activity on previous occasions and were familiar with the creek and the discharge area. After paddling upstream for awhile, the boys began to drift downstream for some distance where there was a swimming hole. After a swim, they drifted

---

* While not clear from the record, it appears that when the turbines were running water would back up to some degree within the aqueduct, so that when the turbines were cut off the quality and force of the water at the discharge point would increase for a period of time.

downstream intending to leave the creek a short distance above the aqueduct discharge point. Christopher was able to get ashore but decedent got caught in the discharge current and, though he was able to grab hold of a tree branch, was carried downstream when the branch broke. His body was recovered about a quarter of a mile downstream at a point where the water was several feet deep. When decedent was taken from the water, his color was described as good by one witness and another testified that he thought he detected a pulse beat while another testified that decedent appeared to be "consciously vomiting". However, paramedics' attempts at cardiopulmonary resuscitation were unsuccessful and decedent was pronounced dead at Ellenville Hospital emergency room where he had been taken by ambulance.

Subsequently, plaintiff, as administratrix of decedent's estate, brought this action for wrongful death and for conscious pain and suffering against the city, who concededly designed, built, maintains and owns the reservoir system and aqueducts, and Central Hudson. Plaintiff alleges that the city negligently designed the aqueduct and was negligent in the maintenance and control of the premises in not properly posting same, and in not erecting barriers so as to enclose the discharge area. In the action against Central Hudson, plaintiff alleges that it was negligent in causing the turbulence in the creek at the discharge point when it knew that children played along the creek, and in failing to fence the area and in failing to supply the area emergency personnel with the telephone number so that the water could be shut off more quickly. After trial, the jury found each defendant 40% liable and found that decedent was 20% responsible; damages of $100,000 were awarded in the wrongful death action and the same amount in the action for conscious pain and suffering. Both defendants have appealed.

Turning first to Central Hudson's contentions, we note that though it makes mention of the weight of and fair interpretation of the evidence, its argument, distilled down, clearly asserts that the jury's verdict was based upon legally insufficient evidence and that even accepting plaintiff's proof as true, Central Hudson was not liable as a matter of law. For this court to so find, it is necessary that we conclude that there is simply no valid line of reasoning and no permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial (see, Cohen v Hallmark Cards, 45 NY2d 493, 499). We so decide.

The uncontroverted evidence demonstrates that the entire system and more particularly the relevant area of the tragedy was designed, built, patrolled and owned by the city. Central Hudson was not an owner in any respect and, accordingly, owed no duty as a property owner and had no right or duty on this record to go upon the lands of another. Additionally, there was no competent evidence presented to show that Central Hudson had notice of any recreational use of the area. Lastly, plaintiff's claim of an improper and inadequate emergency warning system was rendered meritless by the testimony of plaintiff's own expert. The proof demonstrates that the water was shut off at the plant within the reasonable time limits prescribed by the expert. For these several reasons, the verdict for plaintiff against Central Hudson was irrational and must be reversed.

On its appeal, the city first contends that Supreme Court committed reversible error when it refused to permit one of the city's witnesses to testify concerning prior accidents or the absence thereof. It is claimed by the city that its witness would have testified that there had been no deaths or personal injury in the creek area previously. Though no exception was taken to the ruling and no offer of proof made, we nonetheless point out that the lack of evidence of prior accidents is admissible to negate negligence because continued use over a long period of time without incident may indicate that the condition has been proven to be adequate or safe (Orlick v Granit Hotel & Country Club, 30 NY2d 246, 250). However, the defendant must establish that the same allegedly dangerous condition had existed for a number of years and that a significant number of persons had encountered the condition without being injured (see, e.g., Christoforou v Lown, 120 AD2d 387). Although plaintiff's witnesses established that some neighborhood children had previously been in the creek, it was not demonstrated that the conditions were the same or that the children were in the area of the outlet a significant number of times. In the absence of such proof, Supreme Court was justified in excluding the evidence as irrelevant (cf., Matthews v Scotia-Glenville School Sys., 94 AD2d 912, lv denied 60 NY2d 559).

The city also contends that remarks by plaintiff's attorney and one of plaintiff's experts were so prejudicial as to require a new trial. We do not find the remarks separately or collectively to be of such magnitude, and observe that the city concedes that Supreme Court took proper corrective action

regarding the first comment and the city failed to preserve for appeal any objection to the second comment.

Finally, the city argues that the verdict was excessive. As to the award for conscious pain and suffering, despite the city's argument to the contrary, there was sufficient evidence presented so as to permit a reasonable conclusion that decedent consciously struggled for his life for as long as an hour *(cf., Pollock v Collipp,* 124 AD2d 647).

As to the award for wrongful death, the record shows that decedent was 10 years old at the time of the tragedy and left surviving a mother, father, brother and sister. He was in fourth grade at the time of his death and, although his early scholastic performance left something to be desired, after it was discovered that he suffered from dyslexia and this learning disability was diagnosed and treated, he showed marked improvement in his attitude toward school and in his performance there. The record also reveals that he demonstrated above average athletic ability. Fixing the proper amount of an award for pecuniary damages is an extremely difficult task. "[I]n any wrongful death action, especially one involving a child of tender years, the absence of dollars and cents proof of pecuniary loss does not relegate the distributees to recovery of nominal damages only * * * Rather, since it is often impossible to furnish direct evidence of pecuniary injury, calculation of pecuniary loss is a matter resting squarely within the province of the jury" *(Parilis v Feinstein,* 49 NY2d 984, 985 [citations omitted]). In view of the foregoing, we do not find it proper to disturb the verdicts.

Judgment modified, on the law, without costs, by reversing the verdict against defendant Central Hudson Gas & Electric Corporation; complaint dismissed against said defendant and defendant City of New York's liability increased to 80%; and, as so modified, affirmed. Kane, J. P., Main, Weiss, Yesawich, Jr., and Levine, JJ., concur.